# VIELE *v.* CUMMINGS.

---

### PATENTS; INTERFERENCE; CLAIMS.

1. The claim of the issue of an interference is to be interpreted in the light of the specifications of the party first making it.

2. Where the question for determination in an interference was the right of C. to make the claim of the issue, which was suggested to him by the Examiner, and adopted, with the result that the interference was declared, and a motion by V., the other party, to dissolve the interference denied; and it appeared, upon a review of the specifications and drawings of both parties, that V. had in mind a novel and effective means of splicing cable conductors carrying high-tension electrical currents, making the connections of an electrical strength equal, at least, to the insulation on the body of the conductor; while C. had in mind a new conductor for such currents to meet the demand therefor created by the development of enormous electric power by means of great waterfalls, and limited his claim thereto, having no idea of constructing a special joint for, or means of joining cable conductors in general,—it was *held*, reversing the decision of the Commissioner of Patents, that C. was not entitled to make the claim of the issue, the resemblance between the two devices being accidental rather than real.

3. In case of doubt, a claim should be given the evident meaning intended by the party first making it. (Following *Podlesak* v. *McInnerney*, 26 App. D. C. 399.)

No. 426 Patent Appeals. Submitted January 15, 1908. Decided February 14, 1908.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding. *Reversed.*

The facts are stated in the opinion. .

*Mr. Marshall A. Christy* for the appellant.

*Mr. L. S. Bacon, Mr. C. T. Milans, Mr. James Whittemore,* and *Mr. J. H. Milans* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an interference proceeding involving priority of invention of an improvement in connecting conductors for cables, the issue of which is the following:

"As a means for insulating joints in conductors for high voltage currents, a rigid sleeve of nonconducting material surrounding the splice between the conductors forming the bridge or connection between the insulations on the connecting conductors, and having the space between the conductors and the sleeve filled with nonconducting material."

The application of Francis S. Viele [the appellant] was filed August 15, 1902, for an improvement in connecting conductors for cables, and the claim now in issue was adopted December 5, 1902. The application was allowed September 20, 1904, but was permitted to lapse for nonpayment of the fixed fee. It was renewed within proper time, on March 25, 1905.

James F. Cummings's [the appellee's] application was filed February 1, 1902, entitled a "Conduit for Electrical Conductors." The claim of the issue was suggested to him by the Examiner April 3, and adopted April 6, 1905. Thereupon, the interference was declared.

Viele's preliminary statement filed in response to the notice of interference failed to allege a date of conception prior to the date upon which Cummings's application had been filed; and he was notified by the Examiner of Interferences that by reason thereof judgment would be rendered against him unless cause be shown why the same should not be done. Viele thereupon filed a motion to dissolve the interference on the ground that

there was no interference in fact, and that Cummings had no right to make the claim in issue. This was referred to the Primary Examiner, who denied the motion. The Examiner of Interferences, following that decision, rendered judgment against Viele in accordance with the notice that had been given. Viele appealed to the Examiners-in-Chief, who, being of the opinion that Cummings had no right to make the claim, reversed the decision of the Examiner of Interferences, and awarded priority to Viele. On appeal to the Commissioner this decision was reversed and award of priority made to Cummings. From this decision this appeal has been prosecuted.

The question for determination is the right of Cummings to make the claim of the issue.

Viele's application is limited to a joint or splice for electric cables carrying high voltage currents, and his invention is described as follows:

"The invention described herein relates to certain improvements in joints or splices for electric cables carrying high voltage currents. It has heretofore been the practice in making such splices or joints to remove the insulation from the sides of the conductors to be connected a suitable distance, and then form an electrical joint or union between these conductors in suitable manner. Insulation in the form of paper or fibrous tape was then applied by hand to the portions of the conductors from which the insulation was removed. It is a matter of considerable difficulty to determine when a sufficient amount of tape has been applied to render the joint as strong electrically as the original insulation. As considerable care and labor are required in applying the tape, the workman is very liable to shirk it and leave the joint imperfect. And, further, it is practically impossible to so apply the tape as to form a compact uniform thickness of insulation. The foregoing difficulties in applying and incident to the use of tapes in forming the insulation of joints are especially prominent when connecting the conductors of duplex and triple cable, as with such cable the conductor cannot be separated to any considerable extent, and the tape has to be threaded between the conductors.

"The object of the present invention is to provide for easy and quick formation of an insulating covering for the exposed ends of connected conductors, of a uniform thickness and electrical strength which shall be at least equal to that of the original insulation. The invention is hereinafter more fully described and claimed.

"In the accompanying drawing forming a part of this specification, Fig. 1 is a sectional elevation showing my improvement as employed in connecting the conductors of a triple cable, and Fig. 2 is a transverse section of the same on a plane indicated by the line II-II Fig. 1. In the practice of my invention, the sheath 1 and covering 2 of the cable is removed a sufficient distance, and the insulation 3 of the conductors 4 is also removed, as is customary. Sleeves 5 are then slipped over one of the ends of the conductors, and pushed back far enough to permit of the ends of the conductors 4 being electrically connected. This connection may be formed in any suitable manner, as, for example, by means of a metallic sleeve 6, soldered or sweated onto the ends of the conductor projecting into the sleeve, as shown. As the internal diameter of the sleeves 5 is made sufficiently large to slip over the insulation 3 of the conductors, there will be considerable space between the sleeve and the conductor when the sleeve is arranged over the joint; hence, in order to hold the sleeve steady and form an internal support therefor, paper or fibrous tape 7 impregnated with insulating wax is wrapped a few times around the sleeve 6 and the exposed portions of the conductor, and plastic insulating material applied to the tape before the sleeve 5, which is made sufficiently long to overlap the insulation 3 on both sides of the point of union of the conductors, is slipped into position. The use of the tape and plastic insulating material is not necessary for insulating purposes, but it is preferred to employ them both as a centering support of the sleeve, and also as a filling preventing air spaces within the sleeve. After all the conductors have been connected and insulated, as described, the paper sleeves on the several conductors are pressed together, and a large paper sleeve 8, which was slipped over one of the cables before any of the

·conductors were united, is slipped into position over the sleeves .5, as shown, and serves to hold all the parts of the cable. This binding sleeve is not necessary, but is highly desirable as :strengthening the joint. As is customary, a sheathing sleeve 9 is placed around the joint and connected to the sheath 1 of the cable, and liquid insulating material, preferably, is poured into this sleeve until all air is forced out and the sleeve completely filled."

The claim of the issue, having been first made by Viele, is ·to be interpreted in the light of his specifications. He had not in mind a new insulation for the body of conductors, but an improved means for making and protecting the necessary joints in the ordinary cables or conductors for high tension currents of electricity. His object was to "provide for easy and quick formation of an insulating covering for the exposed ends of con- ·ductors, of uniform thickness and electrical strength which ·shall be at least equal to that of the original insulation." He uses a rigid sleeve, which is slipped over one of the ends of the ·conductor, and pushed back far enough to permit the two ·ends to be spliced. The splice is effected by means of a metallic :section or sleeve soldered or sweated on the ends of the conductor which have been brought together. Plastic insulating material is then used as a filling to occupy the space between the splice ·sleeve and the outer sleeve, which is long enough, when slipped into place, to overlap the insulations of the conductor on both · sides of the splice joint. Thus is formed "the bridge or connection between the insulations of the connecting conductors." The plastic material fills the space between the conductor and ·sleeve, so as to prevent air cavities or spaces. The result of the ·whole is an electrical strength equal to that of of the insulation on the conductors.

Cummings's claim of invention was an improvement in in- . ·sulating conductors. Having referred to his drawings, he said: "At the present time it is desirable to find means of transmitting ·currents of exceedingly high tension, so that the power found · in various places in the shape of waterfalls such as Niagara Falls may be transmitted, economically, long distances." Then,

after stating, as the result of experiments, that the rubber covering of conductors will be ruptured by a current of 18,000 volts, and claiming for his conductor a carriage capacity of 65,000 volts, without affecting either the conductor or the insulation, he describes his invention as follows:

"A is the conductor. I first paint this conductor with an insulating varnish, and enclose it between two semi-cylindrical sections C having interlocking joints, such as D, at the meeting edges.

"These sections are made of wood, and are made so that when they are connected they will tightly embrace the conductor. Before assembling it I thoroughly saturate them with some suitable compound to prevent their rotting, such, for instance, with boiled linseed oil. I then enclose the sections thus formed by filling sections E, of wood grooved to embrace the tube or tubes formed by the sections C, having similar interlocking joints as that shown at D in the inner tube, these sections being treated in the same manner before being assembled. The outer sections are arranged so that their joints are intermediate the joints of the inner section, or with so-called 'break-joints.' The conductor with its insulation as thus described is then forced under pressure into a jointless sleeve or casing F, which is previously dipped in liquid asphaltum, the insertion being made while the asphaltum is still wet. I next connect the end of the casing F with a discharge from a suitable pump, or, by any other suitable means, force under great pressure liquid parafine into all of the crevices, and the conductor is complete.

"At the end the inner and outer tubes project beyond the casing different distances, while the conductor D projects still further than either insulating tube, so that the ends may be welded together or otherwise fastened. I then enclose the exposed portions of the conductor by means of sectional insulating blocks G and H formed in sections of the size and shape of the insulating tubes, which will be plainly seen as shown in Fig. 3. The whole is enclosed in a suitable casing or junction box J. Instead of using but a single conductor in a casing I may employ two, as shown in Fig. 4, in which case the outer insulating filling

sections are made in sections, with as many grooves as there are inner tubes or conductors."

His claims during several years of proceedings in the office, until the suggestion of the claim of the issue that had been made in the pending application of Viele, were limited to the insulated conductor aforesaid.

What each applicant had in mind was a different invention. Viele believed that he had discovered a novel and effective means of splicing cable conductors carrying high tension currents, making the connections of an electrical strength equal, at least, to the insulation on the body of the conductor. On the other hand, Cummings had in mind a new conductor for such currents, to meet the demand therefor created by the development of enormous electric power by means of great waterfalls, and limited his claim thereto. He knew, of course, that to utilize his invention the ends of conductors would have to be connected from time to time. He proposed to weld these together, thereby making a continuous conductor of the desired length. His plan of insulation and inclosure was the same along the entire length of his conductor, including the connections. He had no idea of constructing a special joint for, or means of joining, cable conductors in general. Connecting the ends of conductors as described is an incident of his novel insulated conductor for the economical conveyance of very high tension currents.

Considering the claim of the issue in the light of these disclosures, we agree with the Examiners-in-Chief that Cummings is not entitled to make it.

An essential requirement of the issue is the splice of the conductors, which is a special feature of Viele's description. This, and the illustrative drawings, show a real splice by bringing the ends of the conductors together, and brazing on to them the connecting section or inner sleeve surrounding them. Cummings makes no splice, in the ordinary meaning of that word, but welds the connecting ends together, making a continuous conductor with no enlargement thereof at the meeting point. While it is true, as said by the Commissioner, that this enlargement is not set forth in the claim, it is the necessary result of

the actual splice which Viele makes. At the connecting point, as elsewhere throughout its entire length, the conductor of Cummings has fitted around it two semi-cylindrical sections of wood, covered by similar sections of the same material. Wood is a nonconducting material, and the Commissioner was of the opinion that the wooden casing of Cummings is both "a sleeve and a bridge in the same sense in which these terms are applicable to the part 5 of Viele." This conclusion proceeds from a broader interpretation of the issue than we think should be given it, and we agree in opinion with the Examiners-in-Chief, who said: "There is no sleeve forming the bridge or connection between the insulations on the connecting conductors in the sense used in the Viele application." Another requirement is that the space between the conductor and sleeve must be filled with nonconducting material. Turning to Viele's specifications, we find that he introduces plastic, nonconducting material which actually fills this space to the practical exclusion of the air therefrom. While in a general sense it may be said that the insertion of the wooden casing within the outer one fills the space, we do not think that it does so within the meaning intended. As said by the Examiners-in-Chief, "the resemblance of the two devices is accidental rather than real."

It may be that in some respects the claim of the issue is broader than it might have been framed under Viele's specifications, but in case of any doubt it should be given the evident meaning intended by him who first made it. *Podlesak v. McInnerney,* 26 App. D. C. 399, 407, and cases cited.

We are of the opinion that it cannot be regarded as so broad and general as to warrant the claim under the application of Cummings. Believing that Cummings had no right to make the claim, we must reverse the decision. It is so ordered, and that the clerk certify this decision to the Commissioner of Patents as the law requires.                    *Reversed.*

A petition by the appellee for a rehearing was denied February 27, 1908.